Mrs. Thelma G. **BARNUM,** Sammie Mahone, by his next friend Lula Mahone, and Henry Fredrick, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Ross **CHAMBLISS,** individually, and as Chief of Police of the City of Americus, H. Lowell Conner, individually and as Director of Public Safety, State of Georgia, Fred Chappell, individually and as Sheriff of Sumter County, their agents, servants, employees, successors, and all persons in active concert and participation with them, Defendants.

Civ. A. No. 582.

United States District Court
M. D. Georgia,
Americus Division.

Nov. 13, 1965.

Jack Greenberg, Charles Stephen Ralston and Melvyn Zarr, New York City, and C. B. King, Albany, Ga., for plaintiffs.

William E. Smith, George R. Ellis, Americus, Ga., E. Freeman Leverett, Deputy Asst. Atty. Gen., Elberton, Ga., and Peyton S. Hawes, Jr., Asst. Atty. Gen., Atlanta, Ga., for defendants.

ELLIOTT, District Judge.

This is a class action brought by the Plaintiffs against the above named Defendants by which the Plaintiffs proceed under the provisions of Title 42, United States Code, §§ 1971, 1981 and 1983, and Title 28 United States Code, § 1343(3) and (4), seeking to redress what the Plaintiffs claim to be a deprivation of rights secured to them by the First, Fourteenth and Fifteenth Amendments to the Constitution of the United States, and by Title 42 United States Code, §§ 1971, 1981 and 1983 providing for the equal rights of all citizens and the rights of free speech and peaceful assembly. The Plaintiffs allege that the Defendants and their agents and employees have denied to the Plaintiffs and members of their class by the use of force, intimidation, threats, etc., the right to conduct peaceful public meetings, marches and demonstrations, and further allege that the Defendants have failed to afford to Plaintiffs and members of their class adequate police protection against violence and harassment by persons hostile to their cause. The Plaintiffs allege that they are Negro citizens of Americus, Georgia and claim that they have no adequate remedy at law and contend that since they wish to continue their demonstrations and marches seeking a redress of claimed grievances, it is necessary that this Court issue its injunction enjoining the Defendants, their agents, servants and employees, from (1) preventing or interfering by violence, threats, intimidation, arrests or threats of arrest, or in other ways, with Plaintiffs and members of their class in peacefully assembling, marching and demonstrating at reasonable times and in such a way as not to create undue congestion or undue interference with traffic in the City of Americus, Georgia, to protest matters which they desire to protest, and (2) from failing to provide Plaintiffs and members of their class with adequate police protection to insure that they will be free from threats, violence, intimidation and harassment from persons hostile to and seeking to interfere with their attempts to exercise their constitutional rights.

The Defendants have filed their answers in which they deny the material allegations of the complaint and they contend that they have not interfered with the free exercise by the Plaintiffs of their constitutional rights and deny that they have used force, intimidation, arrests or threats of arrest, to prevent the Plaintiffs from conducting public meetings, marches and demonstrations, and deny that they have failed to afford to Plaintiffs and members of their class adequate police protection against violence, intimidation, threats or other harassment. The Defendants have also filed a timely cross-claim against the Plaintiffs by which the Defendants assert that the Plaintiffs and the members of the class they represent have deliberately set out to disturb the peace and tranquility of the citizens of Americus, Georgia by provoking breaches of the peace under the guise of exercising their constitutional rights, and that pursuant to such purpose they have conducted unreasonable, unwarranted and unlawful marching and picketing to such an extent that it has been necessary to devote all of the police forces of the community to the protection of the marchers and pickets and demonstrators, to the general harm and detriment of the community, and they ask that the prayers of the Plaintiffs' petition be denied and that, on the contrary, the Plaintiffs, and the members of their class acting in concert with them, be enjoined from the unlawful conduct complained of and from conducting unreasonable and illegal marches and picketing in the city and that the Plaintiffs be required by order of this Court to comply with certain basic requirements concerning marches and picketing.

Since prayers for both temporary and permanent injunction are involved it was stipulated that the matter would be submitted with regard to questions of temporary and permanent injunction without the necessity for further hearing.

In the complaint as filed the Plaintiffs have made reference to alleged denial of rights secured by the Civil Rights Act of 1964 with regard to service in places of public accommodation and also make reference to denials of their right to vote, but since no evidence whatever was introduced by the Plaintiffs with respect to these matters the Court concludes that these allegations were either made carelessly or for the purpose of window-dressing, and no consideration will be given to these contentions. All of the evidence related to marches, mass meetings, picketing and some isolated incidents having tenuous connection thereto, and it is these matters that will be dealt with.

This complaint was filed on August 4, 1965 and hearing with respect to the matter was begun on August 11, 1965 and the hearing continued for more than a week. A record of approximately 1,600 pages was compiled and having now been made available to the Court for review the record has been reviewed and the Court now makes the findings of fact and reaches the conclusions of law embodied in this opinion, which is intended as compliance with the requirements of Rule 52 of the Federal Rules of Civil Procedure.

The City of Americus, Georgia is in Sumter County. The population of the city is between 14,000 and 15,000. In the latter part of July, 1965 the Sumter County Movement, which is an organization of local Negro citizens, in conjunction with various other outside civil rights groups, decided to subject the City of Americus to mass meetings, marches, picketing and public demonstrations. Beginning July 22 and extending through August 12 twenty-eight mass marches were conducted from one or more Negro churches through the city's business district to the Sumter County Courthouse and return. These marches consisted of a minimum number of about 100 and a maximum number of about 1,200 marchers. The average number was about 300. There were also twenty-eight mass meetings in front of the Courthouse and the number attending the mass meetings was usually somewhat larger than the number participating in the marches. On some days the demonstrators would conduct one march, on other days two marches, and on some days as many as three marches per day. Although the time for the marches was never predictable, they usually occurred around 12:00 o'clock noon and around 6:00 p. m. and around 10:00 o'clock at night.

The police force in the City of Americus consists of 16 men and the Police Chief. These men normally operate in shifts of 8 hours, which means that normally about 5 or 6 men are on duty on each shift. There are 16 firemen in the Fire Department and they operate on 24 hour shifts, 8 firemen being on duty for a 24 hour period and then being off for a 24 hour period. The County's police force consists of the Sheriff of the county and one deputy.

Before the demonstrators began their mass marches on July 22 no one representing them contacted the Chief of Police or anyone else in authority for the purpose of discussing any time or route for the marches nor for the purpose of obtaining any official approval of the time and method of staging the marches, nor for the purpose of arranging for any police protection or for any other purpose connected with the proposed demonstrations. The leaders of the Sumter County Movement simply called the Chief of Police about one hour before they had decided to stage a march and told him that that was what was going to be done. This was typical of the circumstances surrounding all the marches. The leaders of the demonstrators never at any time made any attempt to coordinate any of the marches with the other responsibilities of the police forces in order that protection might be at a maximum. Neither did they ever attempt to coordinate their marches with traffic conditions or other safety requirements in the community. Indeed, the evidence shows that the three peak hours of traffic in the downtown section of the city are

around 8:00 a. m., 12:00 noon and 6:00 p. m., and the 12:00 noon and 6:00 p. m. hours were the hours most favored by the marchers, this being the time at which police officials would have the most difficulty in handling the situation.

The route which the marchers used most frequently during the period of the marches was one which originated at one of the Negro churches and then proceeded through the city in a westerly direction on the most heavily traveled street in the downtown section, this being U. S. Highway No. 280. The route of the march was usually about one-half of a mile to the Courthouse and about the same distance back.

Whenever the marches were held the Chief of Police summoned his entire police force, those on duty and off duty, and all off-duty firemen, they being designated as auxiliary policemen, and used all available Georgia State Patrolmen to provide protection for the marchers as they marched to the Courthouse, and while they were assembled in front of the Courthouse, and on their return from the Courthouse to their return destination. At the request of local police authorities the Governor of the State authorized the use of all State Patrolmen who might be needed to provide protection for the demonstrators and preserve the peace. State Patrolmen were actively on the scene during the entire period covered by the marches and demonstrations. Their numbers varied from time to time depending upon the circumstances. At times there were as many as 130 State Patrolmen protecting the demonstrators. The average number on hand throughout the period was about 85. The head of the State Department of Public Safety was personally present a considerable part of the time and other top officers of the Patrol were always present. There was excellent coordination between the activities of the State Patrol, the Sheriff's Department and the City Police force. All the combined police forces were also used to protect the participants in the mass meetings held in front of the Courthouse, after the marchers had reached the Courthouse and until the marchers decided to leave.

The marchers did not always inform the Chief as to what route they proposed to follow and they did not always follow the same route in returning as that used in going to the Courthouse. They would sometimes return to one Negro church and sometimes return to another in another part of town. They would sometimes get to the Courthouse and have their mass meeting and then would decide to go back a route different from that which they had indicated they were going to follow. This made it necessary for the police forces to change their positions at street intersections and elsewhere on a moment's notice in an attempt to provide protection simply to accommodate the change in mind of the leaders of the marchers along the route.

During the course of the 28 marches the leaders of the Movement would sometimes notify the Chief of Police of their intentions an hour or so in advance. At other times they would notify him only about 10 or 15 minutes in advance, and in many instances gave him no notice whatever until the march was ready to proceed and then they would call him by telephone and tell him they were getting ready to march. In other instances they would notify him that they were going to march at a certain hour and then they would begin the march ahead of that time. In still other instances they would notify him that they were going to march at a certain hour and when that hour arrived the march would not occur and they would tell him that the march had been put off for two hours and as soon as he had released his men to report back two hours later they would then begin the march ahead of the new hour which had been designated. The effect of all of this was to change what could otherwise be a well planned operation into a spur-of-the-moment operation and made it impossible for the police forces to ever know with any degree of certainty when their services were needed. During all this time the Police Chief repeatedly requested the leaders of the Movement to

give him advance notice of the times and the routes of the marches, but they never cooperated with him in this respect.

Whenever the marches occurred the Police Chief led the march in his official car and the highest officer present from the State Patrol would be next in line in his automobile, all street intersections would be protected and traffic stopped by city policemen and firemen and both flanks of the march would be protected by State Patrolmen and City policemen marching alongside the demonstrators and between them and any persons standing on the sidewalk. Police cars and cars of the State Patrol also protected the rear of the march. Police cars also proceeded in advance of the march to check the route and to observe all alleyways and buildings along the route of the march for any suspicious persons or any signs of any trouble which might develop. All traffic was halted on the route of the march while the march was in progress, this resulting in traffic being blocked usually over a distance of approximately half a mile. These same procedures were used on the marches to the Courthouse and on the return marches.

The Chief of Police and the head of the State Patrol requested those organizing the marches to see to it that the marchers proceeded in a column of two's in order that there would be no bunching and in order that protection might be at a maximum. Frequently this procedure was not observed. The marchers were always preceded by a bus with a loud speaker mounted on it and some person in the bus was constantly speaking to the people along the route urging them to join the march, and frequently groups on street corners would join the march, substantially increasing the size of the march, resulting in considerable confusion, and creating additional problems in an effort to contain the march and protect it because when these groups joined the march this broke up the two abreast arrangement and it was impossible for the police to always know whether those who were joining the march from the corners were friendly to the march or whether they were getting into the procession for the possible purpose of causing some disturbance. The police officials requested the leaders of the march to eliminate this practice of having persons join them from the street corners and maintain the two abreast procedure, but they never complied with this request, with the result that the march frequently became very irregular with groupings which were not uniform.

The Chief of Police requested the leaders of the Sumter County Movement to designate some one or two persons with whom he could maintain contact to be better informed concerning the marching so that there could be coordination for police protection, but no such person or persons ever were designated. On several occasions the Chief of Police asked the President of the Sumter County Movement, Rev. J. R. Campbell, to sit down with him and talk about orderly procedures with regard to the time and route of the marches, but the Rev. Campbell was never willing to discuss the matter with him, telling the Police Chief that no one person could control what the marchers would or would not do, and that he himself was not willing to discuss these matters with the Chief. On two occasions when he had no previous notice that a march was to take place until the Rev. Campbell called him on the phone and told him they were getting ready to march, the Chief got in his car and drove to the church where the march was to begin and asked the Rev. Campbell to postpone the march for a few moments until he could contact his off-duty men to protect the route, and in each instance the Rev. Campbell declined to postpone the march and it was necessary for the Police Chief to do the best that he could to assemble his men.

Although the City of Americus has a parade ordinance the marchers were never required by the City to obtain a parade permit and the marchers were never arrested or harassed in any way by any of the police officers. On a number of occasions the police officers observed

improprieties on the part of individual marchers during the course of the marches which would ordinarily have had the attention of the police forces, but no arrests were ever made for such conduct because the police force had determined to avoid making any arrests unless they were absolutely necessary.

The usual time consumed for a march to be completed was about two hours. This involved about 45 minutes reaching the Courthouse, about 30 minutes at the Courthouse, and about 45 minutes on the return. As they marched in the streets the marchers usually clapped their hands and shouted slogans and sang songs and sometimes danced, all to the accompaniment of the loud speaker mounted on the bus. The noise created could be heard for two or three blocks. On two occasions during the marches there were fire alarms and the City's fire equipment was required to take a circuitous route to reach the scene of the alarm to avoid crossing the march route. Citizens in the community and business people in the downtown area frequently complained to the City officials about traffic being blocked for these long periods of time for the benefit of the marchers and to the inconvenience of all others, but the police forces blocked the traffic for the benefit of the marchers nevertheless.

Whenever a march was held all of the on-duty and off-duty policemen were used and all of the off-duty firemen were used and this meant that during that time the remainder of the city was going without normal protection and throughout the period of the marches many of the policemen and firemen were on duty as much as 16 or 18 hours a day. All normal leaves were cancelled and all off-duty policemen and firemen were subject to call at all times. All of this created an atmosphere of stress throughout the city which could have been eliminated to a considerable extent if the leaders of the demonstration had cooperated with the police officials who were seeking to provide them with adequate protection and at the same time maintain law and order generally throughout the community, which was entitled to normal police protection.

Friday and Saturday are the heavy traffic days and the days on which most business activity is conducted in the city of Americus and the Chief of Police attempted to get the leaders of the Movement to call off some of their marches during these peak periods or reschedule them for other hours during the day, but the leaders of the Movement always declined to do so.

On one occasion the Chief of Police was called on the telephone and was told that the march was going to originate at one point at a certain time. In a few moments he was called by another person who was one of the leaders of the Movement and was informed that the march was going to originate somewhere else. It developed that two different marches originated from the two different places and later joined, thus adding further to the considerable burden for police protection. On still another occasion after the mass meeting at the Courthouse the marchers instead of returning by the route previously indicated to the Chief of Police, split up into two columns and one group returned by that route and another group returned by an entirely different route without any previous notice, thus adding further to the complications.

On August 5 a march was held at 6:00 o'clock and this march involved about 300 persons. As the march was returning from the Courthouse, without any advance notice to the police officials that they were going to do so, all of the marchers, for no apparent reason, suddenly sat down in the middle of the street and began shouting, "We will do what the spirits tell us to do." Being determined to make no arrests unless it became absolutely necessary to do so, the police forces simply blocked off all traffic in all directions and allowed the demonstrators to sit there in the middle of the street and sing and shout until the "spirits" told them to get up and go, which they did after about 10 minutes. On that same date after the 6:00 o'clock

march was completed the Chief of Police inquired of Rev. Campbell whether there was going to be any more marching that night and he was assured by the Rev. Campbell that there would be no more marches that day and that he could handle his men accordingly, so the Chief prepared no protection for any march that night and he himself went home for some needed rest. A few minutes before 10:00 p.m. he received a telephone call from Rev. Campbell saying that the demonstrators had changed their minds and were going to march again that night, making it necessary for him to contact his forces as best he could and make arrangements for the best protection possible in the circumstances. The foregoing is typical of a great volume of detail of this nature in the record in this case.

Not only did the marchers fail and refuse to cooperate with the Chief of Police, the head of the State Patrol, and the Sheriff's Department to assure that there would be no incidents of violence, but the record in this case also reflects a number of instances when the leaders of the demonstrations and those making speeches to the mass meetings and those participating in the marches said things and performed acts designed to provoke violence either to themselves or to others, typical of which are the following:

On July 22 a group of 19 white citizens of Americus attended a meeting at the Friendship Church, this being the Negro church from which a march had originated on that day and from which most of the subsequent marches originated. This group of white citizens included the Mayor of the city and the members of the City Council and the President of the Chamber of Commerce, and the meeting took place immediately following the conclusion of the marching on that day. These white citizens had been invited to this meeting by Rev. Campbell, the President of the Sumter County Movement, because these citizens had been working on a plan to resolve any racial trouble in the community and they had accepted the invitation of Rev.

Campbell to attend the meeting as a show of good faith on their part. The principal speaker to the mass meeting in the church while these white citizens were in attendance was a Rev. Boone, who dealt at some length with various complaints in an inflammatory manner and then stated to the audience, "There ain't no good white people," and then looked directly at the white citizens who were seated there and repeated the statement, "There ain't no good white people." Then he looked back to his audience and repeated the statement again, "There ain't no good white people and all these people want to do is to bloody your head." He further went on to say that white men had been raping Negro women for many years and other matter of that nature, working his audience into an attitude of high excitement.

On another date Willie Bolden, one of the speakers addressing a mass meeting in front of the Courthouse, suggested to the demonstrators that if their demands were not met they should "tear up the town". When this suggestion was made the crowd loudly applauded, cheered and shouted.

On another occasion Judson Ford, who had come to Americus from Savannah to help lead the demonstrations, made a speech to the mass meeting in front of the Courthouse during the course of which he shouted, "I am not here to play. I came to get a job done. You know what they call us in Savannah,—white-folks-straighteners."

On still another occasion this same Judson Ford, addressing the demonstrators in front of the Courthouse, said during the course of his speech that they had had swim-ins, sit-ins and kneel-ins and that they might decide to have a piss-in, and when he made this statement Willie Bolden, who was standing beside him, shouted to the crowd over the loud speaker, "You all heard what the man said—He said piss-in." There were about 300 people present at this time, consisting of men, women and children, and the speech was being broadcast over the loud speaker system and could be

heard by persons seated on the porches of their residences in the area surrounding the Courthouse.

In another speech made to the demonstrators in front of the Courthouse the same Judson Ford, during the course of his speech, denounced white people in general and observing a group of white persons standing across the street shouted to them, "Come and get us! We are ready for you!"

In another speech made to the demonstrators in front of the Courthouse Willie Bolden told the crowd that the Martin Luther King Construction Company was going to reconstruct Americus and that, "We may have to tear it down before we reconstruct it."

On another occasion while the demonstrators were assembled in front of the Courthouse before making the return march to the church a Negro man, one of the marchers, observed a group of white people standing across the street as onlookers and he moved out to the edge of the crowd of demonstrators and over near where the white people were standing and extended his buttocks in their direction and patted himself on that part, the meaning of such gesture being well understood to be, "Kiss my ass!" This same gesture was observed as being directed toward spectators along the route of the march.

Some of the marchers were also observed from time to time during the course of the marches to address remarks to and make vulgar gestures at some of the police officers who were seeking to provide protection for them. One marcher told a police officer that he was going to "stick his foot up the officer's ass". Another marcher made the announced threat that he was going to go home and "get his 38 and straighten the officers out".

Other marchers were observed from time to time to make a vulgar gesture toward police officers, the obscenity of which we consider to be beyond the limits of detail which we should set forth in this opinion, but the nature and meaning of which is fully set forth in the stenographic record.

On the other side of the ledger it should be noted that there were instances during which white spectators standing on the sidewalk as the marchers proceeded in the street would at times make catcalls at the marchers and occasionally shout out some matter of a critical or derogatory nature, however, considering the number and the size of the marches and the small amount of evidence in the record regarding incidents of this kind we gather that the marchers were largely ignored by those who did not agree with their purposes and activities.

It has heretofore been noted that there were four marches at night, usually around 10:00 o'clock. On two of these occasions the demonstrators remained on the Courthouse lawn for what was called a "vigil", and on one of these occasions they remained there until about 2:00 a. m., and on another occasion until about 3:00 a. m. During these several hours they engaged in singing, chanting, praying and doing other things which might or might not be legitimately embraced within the term "demonstrating", some of the details of which are also in the stenographic record but will not be here repeated. The noise of their vigil activity could be heard for a considerable distance and, as might be expected, residents in the area made complaints to the Sheriff and the Chief of Police that the noise was interfering with their sleep and preventing them from obtaining rest at night. On one of these nights when such complaints were made the Sheriff and the Chief of Police discussed the complaints with Rev. Campbell, the leader of the demonstrations, and asked him to prevail upon the crowd to be less noisy, to which request the Rev. Campbell replied that one of the purposes of the demonstration was to create attention and to make people notice that they were there, and that one of the ways to do that was to make noise, and thereafter instead of becoming quieter the singing became louder and continued so until the demonstrators

decided to return to their church about 2:00 a. m.

It might be noted that all of the inflammatory speeches and provocative acts heretofore described as having been committed by the marchers and demonstrators and their leaders were things which were said or done by those who give lip service to the philosophy of "non-violence".

In spite of the refusal of the marchers to cooperate with the police in planning the time, place and manner of the marches and in spite of the fact that the marches were conducted in both day and night time hours, and in spite of the fact that there were 28 separate marches extending over a period of 21 days, the marches involving a total of approximately 8,400 marchers of various ages, educational levels and standards of conduct, and in spite of the inflammatory and provocative speeches and incidents heretofore referred to—in spite of all of these things the evidence shows that there was not a single instance in which any city policeman, Sheriff or State Patrolman halted or sought to halt any march or any demonstration, nor a single instance in which any arrest was made of any marcher, or any demonstrator, nor a single instance in which any marcher or any demonstrator was physically harmed in any manner. The evidence also shows that during this entire period there was never any complaint made by the leaders of the Sumter County Movement or by any individual marcher or demonstrator that there was any lack of adequate police protection for them, nor was any complaint made to any police officer with regard to any incident of violence of any nature committed against any marcher or demonstrator. By the term "police officer" we include city policemen, Sheriff's forces and State Patrol.

Indeed, the only act of substantial violence which occurred during the marches and mass meetings and vigils was not an act directed at the marchers and demonstrators but was the murder of a young white man who was shot while standing on a street corner on one of the evenings when the demonstrators were holding one of their all-night vigils and two members of the class represented by the Plaintiffs have been indicted for that offense.

It might be added here that members of the Federal Bureau of Investigation were present in the community throughout the period of all of the marches and demonstrations for the purpose of observing the entire situation and that they never observed any act of violence against any of the marchers, nor any interference with the marches or mass meetings, and they never had reported to them any such incidents having occurred and they never made any request or suggestion to the City, County or State Patrol authorities that there was any inadequacy of protection.

During the same period in which these mass marches and meetings were taking place the civil rights groups were also conducting picketing of certain business establishments in the city, principally against the food establishments, Colonial, Kwik-Chek and Piggly Wiggly.

On the night of July 30 at a mass meeting at the Friendship Church the Sumter County Movement had adopted a motion or resolution or something of that nature calling for the boycott of certain merchants, among them the Colonial Store and the Kwik-Chek Store. The next morning a number of the members of the Movement began picketing the Colonial Store and this picketing continued until about 1:00 p. m. At that time about 40 of the pickets entered the store and for all practical purpose actually took possession of it. Each of the pickets got a push cart customarily used by the customers in self-service food stores and pushed the carts around in all the aisles of the store pretending to be shopping. As the customers who were in the store left the pickets soon obtained possession of all of the push carts in the store except one. For more than two hours they pushed these carts around in the store and while so doing sang songs, chanted and clapped their

hands and at times sat down on the floor in the aisles, all of which made it virtually impossible for any other customers to be served. In light of, the situation the manager of the store locked the entrance doors but left the exit doors open. He decided to tolerate the situation and not have any arrests made. After more than two hours, during which time they bought nothing, the pickets left the store. Word of this situation spread rapidly in the community in which the store is located and many of the store's customers were for several days afraid to come to the store and the store's business was badly off for a period. Counsel for the Plaintiffs during the course of the hearing on this matter were invited by the Court to attempt to justify this conduct on the part of his clients, but no effort has been made by Counsel to do so.

After the pickets had engaged in the illegal and reprehensible conduct above described at the Colonial Store they proceeded in the direction of the Kwik-Chek Store, which is located some blocks away, with the intention of occupying the Kwik-Chek Store and making it impossible for that store to transact business just as they had done at the Colonial Store. The manager at Kwik-Chek had learned of the situation at Colonial and when he saw the pickets approaching his store he locked the doors to prevent them from entering. When the pickets reached the store and found that the doors were locked they began beating on the glass doors and on the glass windows with their hands and fists and shouting, demanding to be admitted. After this went on for some time the pickets lay down or sat down on the walkway immediately in front of the entrance doors so that it was difficult if not impossible for persons to either enter or leave the establishment by the front entrances and exits. There were a number of customers in the store at the time of this commotion and some of the women customers were quite upset, some of them to the extent of weeping, and it was necessary for the store personnel to es-

cort some of the customers out of the back doors and accompany them to their homes to allay their fears. After the pickets had remained in their prone or sitting positions in front of the entrances to the store for some time a group of about 8 or 10 white persons approached the front of the store—some of them having members of their families still inside the store—for the purpose of gaining entrance. The entrances being blocked by the pickets, a brief scuffle ensued between the two groups involving some pushing and shoving, the entire incident lasting only a few seconds. The pickets then removed themselves from the front of the doors and normal entrance to the store was restored. By the time this scuffle ensued between the two groups a number of State Patrolmen and City policemen had arrived on the scene and a number of them witnessed everything that took place and testified about it.

In this case the Plaintiffs place great stress on what they claim to have been a lack of adequate police protection for this group of pickets at the Kwik-Chek Store on this occasion, claiming that certain acts of violence took place which could have been prevented by the police. In the first place it should be noted that the pickets did not notify the police that they intended to even go to Kwik-Chek, so it is not clear how the police were supposed to have known to be there to protect them. In the second place it would in no event be the obligation of the police to protect the pickets in an attempt to physically take over a business establishment by completely occupying it on a pretense of shopping so as to bring the business to a standstill. And in the third place the evidence falls considerably short of being convincing that the acts of violence described by the Plaintiffs did in fact take place.

The evidence introduced by the Plaintiffs with regard to claimed acts of violence on this occasion comes from three of the pickets, Sammie Rushin, Dennis Lienau and Charlotte Thurber.

Rushin says that when the pickets got to the Kwik-Chek Store that the employees of the store came out front with knives and sticks and rubber hoses and beat him and all the rest of the pickets. This is not confirmed by any other witness. It is denied by all of the State Patrolmen and City policemen who were there. It is denied by the store manager. It is not confirmed by any customer who was in the store or by any other onlooker. Although Rushin was testifying before the Court only 12 days after this incident occurred, he did not point out any bruise or injury of any nature. Further light is shed on the credibility of this witness by the fact that Rushin was one of the pickets who occupied the Colonial Store earlier that afternoon and when questioned about why the group of 40 pickets entered Colonial and stayed in there for over two hours, his explanation was that the manager of the store invited them to take the store over and have a private party, that the manager wanted to give them a place for a private party, and that the manager told them they could do anything they wanted to in the store and that the manager approved of their singing and of their sitting down on the floor and rolling the carts around, and that the manager told them that they could have whatever they wanted to put in their shopping baskets they could have anything in the store without paying for it. Rushin's general credibility may be judged by this testimony.

Dennis Lienau says that the pickets, of which he was one, were simply sitting peacefully in front of the Kwik-Chek Store when a mob of white people armed with pistols, sticks and other weapons beat upon all of the pickets, beating all of them severely, and he says for his part that he was "pistol-whipped" until he fell to the sidewalk and he says that a number of the other pickets were so badly beaten that they could not rise and were not able to walk. All of this is denied by all of the State Patrolmen and police officers who were present. On cross-examination he could not identify any person by name or otherwise who did any of the pistol-whipping or beating. In fact, he could not recall the names of any of the other pickets who were hit other than himself, yet he insists that at least 15 of them were beaten. He was on the stand testifying in this hearing only 12 days after the incident is supposed to have occurred, but he pointed out no bruises, no injuries of any nature, nor did he offer to identify any place or places on his head or body where he was "pistol-whipped". Further light is shed on the credibility of this witness by the fact that when he was asked what his purpose was when he went into the Colonial Store earlier that afternoon and remained in there for over two hours pushing a shopping cart around he testified that he went there to get a tube of toothpaste and that it took him that long to find the brand that he wanted. When reminded by the Court that he was under oath and was asked directly by the Court whether it was not a fact that he went there and engaged in this activity for the purpose of impeding the operation of the business, he evaded answering the question by insisting that he did not know the meaning of the word "impede", although he is a college graduate.

Charlotte Thurber says that while she was sitting on the sidewalk in front of the Kwik-Chek Store and while State Patrolmen and city policemen were standing around observing that a group of white men approached with sticks and other weapons and beat her with these sticks and other weapons for approximately 10 minutes, and she says that she eventually fell to the ground from the beating and was then kicked by the men and beaten further for some time longer and was eventually told to stand up and when she could not stand up she was further kicked and beaten all over her body until she was kicked completely off of the sidewalk. This young lady's story is denied by every policeman and State Patrolman who was in the area and is not confirmed by any other witness and she was in court testifying in this hearing 11 or 12 days after the incident is

supposed to have occurred and she was carefully observed by the Court and she had no bruises, no scars, no disfigurement, no difficulty in movement, and all-in-all appeared to the Court to be quite hale and hearty and indeed, enjoying her experience, and on examination by the Court she admitted that although she says that she was so severely beaten and kicked for such a long period of time that as soon as it was over she walked with the group of pickets back to Freedom House from whence they had come, and that she never saw a doctor about any injuries sustained and that she was not disabled in any way. The Court also notes that there is a photograph in evidence in the case showing her in a picket line in front of the same store only 48 hours after she claims to have sustained such a severe beating.

With regard to the testimony of all three of these witnesses, Rushin, Lienau and Thurber, the Court takes judicial notice of the fact that throughout the period during which the marches and mass meetings and picketing episodes were going on in the City of Americus the news services and the television networks had reporters and photographers in large number actively on the scene displaying their usual eagerness to observe and report any incident of violence involving any civil rights worker or demonstrator and none of them saw, photographed or reported any such incidents as described by these three witnesses, and none of the three ever swore out any warrants against anybody in connection with the incidents or attempted to identify anybody who had abused them to any police officer by name or description, although it does appear that they told the Chief of Police and a patrol officer while still in front of the Kwik-Chek Store that afternoon that they had been beaten and complained to them that they had not been given police protection.

The Court finds as a matter of fact in the light of all the attendant circumstances that the acts of violence described by the witnesses Sammie Rushin, Dennis Lienau and Charlotte Thurber, did not in fact occur.

The record does disclose, however, that during this period of picketing there were two acts of violence involving pickets. During the afternoon of August 2 some pickets were picketing in front of the Kwik-Chek Store and as the pickets were walking back and forth on the sidewalk near the curb a man who had been standing nearby for several moments suddenly pushed one of the pickets off the sidewalk causing him to fall in the street. The picket was not injured in any way and he immediately took his place again in the picket line and the man who did the pushing passed on through the doors and into the Qwik-Chek Store. All of the evidence is that the man who did the pushing had not done anything to indicate that he had any intention to do such a thing and there was no reason for the officers present to anticipate such action on his part. The police officers later identified the man who did the pushing and an appropriate summons was issued and he was awaiting trial for the offense at the time of the hearing in this case.

On August 4 the Piggly Wiggly Store was being picketed and a man later found to be under the influence of intoxicants walked down the sidewalk by the picket line and suddenly turned and slapped one of the pickets. A State Patrolman who was standing by immediately seized the person who did the slapping and placed him under arrest and he was awaiting trial at the time of the hearing in this case. The picket was not injured and in fact never left the picket line and never made any complaint to any of the officers with regard to the matter.

These are the only two incidents of violence of any nature shown by the evidence in connection with picketing and, as noted, in each instance the offenders were arrested and are being prosecuted.

In connection with their contention that there has been a failure on the part of the police officials to provide adequate police protection for those engaged

in civil rights activities or an abuse of police power in connection with making arrests, the Plaintiffs offered evidence with regard to certain isolated incidents and the substance of what appears from the record in this regard is as follows:

John Barnum III, a Negro college student, testified that on July 21 he had parked his automobile in front of the Sumter County Courthouse and that an automobile came by containing two white men and that one of them hit the side of his automobile with an object which he believes to have been a hammer. He was not engaged in any march or demonstration or picketing activity at that time. In fact, that was before the marching activity began. He says that he reported this incident to the City Police Department, but that since all he could give them by way of information was the tag number of the automobile, they did not make any investigation concerning it. He admits that he could not identify the persons or describe them. His further testimony indicates that he now believes that he can identify the person who struck his automobile, and if he can there is no reason why he should not proceed to swear out an appropriate warrant on his own initiative. Reviewing all the evidence in the record about this incident the Court is not convinced that there was any deliberate failure on the part of the police to discharge their duties, and even if it should be thought that there was it is not clear that there is any connection between that incident and the civil rights questions presented in this complaint.

This same witness, John Barnum III, complains that he was arrested by a City policeman on August 1 for violation of a city traffic ordinance, but from his testimony it is clear that he admits that he was violating the ordinance, but he seeks to justify his conduct by saying that he was forced into the violation by someone else. This is a question which this Court does not feel called upon to decide it being better left to the traffic court for determination. Barnum was not engaged in any march or picketing activity at the time.

Another incident referred to by the Plaintiffs occurred on August 4 in the community of Plains, Georgia, which is an incorporated municipality some 10 miles distant from Americus. The evidence shows that a man by the name of Bill Rau had gone to Plains in connection with some civil rights activity of some nature and that while there he was the victim of an assault. The evidence further shows that when this matter was reported to the State Patrolmen these officers conducted an investigation and that the party who committed the assault was apprehended and is presently awaiting trial for the offense. No complaint was ever made with the Sheriff of Sumter County about the incident since the State Patrol handled it. The evidence shows that the State Patrolmen arrived within 15 minutes after they received a call concerning the matter and that the arrest was made as soon as the identity of the offending party had been established. The Court does not find anything in this incident to support any contention of failure on the part of the State Patrol or on the part of the Sheriff of Sumter County to provide adequate protection for Mr. Rau. Certainly it cannot be contended that it is the duty of the State Patrolmen or the Sheriff to provide a bodyguard for civil rights workers.

Collins McGee, a Negro man, testified that on July 20 (prior to the date that the demonstrations and marches began) he was working around the polls at a Justice of the Peace election at the Courthouse in Sumter County and that a white man by the name of Littlejohn struck him with his fist and he says this happened while he was sitting in his automobile. He says that he called to a police officer who was some distance away asking the police officer if he wasn't going to do something about it, and he complains that no action was taken with regard to it. Presuming that this incident occurred, it affirmatively appears from McGee's own testimony and further

from the testimony of the Sheriff and his deputy and from the testimony of all the City policemen who were on duty around the polls on that date that McGee never made any complaint to them concerning the matter and that he never sought to obtain any warrant for the arrest of the person who struck him. One of the City police officers who was on duty outside of the Courthouse recalls that McGee while getting into his automobile called to him and asked him what he was going to do "about that man", but that he did not understand what was sought to be conveyed by the call nor what the man might have done, and that McGee immediately drove off in his automobile and never spoke to him further about whatever it was that he had in mind. It does not appear that any police officer witnessed the incident referred to or had any direct information concerning it.

The Court feels that no further detailed analysis of the evidence is necessary. As is always true in cases of this type, there is a sharp clash between the testimony of witnesses about details and specific incidents, and the Court, having had opportunity to observe all of the witnesses, has ascribed the degree of credibility to their testimony which the Court feels is deserved and has resolved the issues of fact in conformity with the evidence which the Court deems most credible and otherwise trustworthy, and if any specific incident has not been referred to it is because the Court has not deemed it of sufficient significance to be dealt with at length.

■ The Plaintiffs have the burden of proving their contentions as set out in the complaint and a review of the record clearly shows that in this case they have not carried that burden. Instead of the evidence showing that there has been a failure on the part of the Defendants to provide adequate police protection for the Plaintiffs in their civil rights activities, the Court finds on the contrary that the Police Department of the City of Americus and the Sheriff's office of Sumter County and the Georgia Department of Public Safety, operating through the State Patrol, have provided protection for the Plaintiffs in a highly efficient and satisfactory manner, in many instances quite beyond the call of duty, and that they have not used their police power to prevent the Plaintiffs exercising their constitutional rights either by arrests, threat of arrests, intimidation or otherwise. Accordingly, all of the Plaintiffs' prayers for injunction are denied.

■ With regard to the Defendants' cross-action seeking to enjoin the Plaintiffs and members of the class represented by them from engaging in unreasonable and oppressive activities the Court concludes that the evidence shows that the Plaintiffs and the class they represent have in some instances carried on their marches, demonstrations and picketing in an unreasonable manner not within the contemplation of the guarantees of freedom of speech and assembly, but since the marches and demonstrations have apparently ceased the Court will withhold the issuance of any injunction. Instead, in view of the present situation, the Court retains jurisdiction of this matter insofar as the cross-action is concerned and in the event future circumstances make it appropriate the Defendants or their successors in office are granted leave to reapply to this Court for such further order as seems proper in light of the then existing circumstances by which order the bounds may be set within which marches, mass meetings, demonstrations, picketing and other such activities may be reasonably carried on by the Plaintiffs and the nature and limits of the responsibilities of the Defendants to provide police protection therefor may be delineated.

The right to demonstrate is not unlimited. The duty to protect the demonstrator is not boundless.